[No. 1485.]

R. A. McWhorter v. The State.

1. PRACTICE.—Rule 56 for the district courts allows exceptions to evidence admitted over objection to be embodied in the statement of facts, in connection with the evidence objected to. And this rule applies to criminal as well as civil cases.

2. SAME.—District Court Rule 56 can not be so extended as to permit the incorporation into a statement of facts of exceptions to evidence excluded.

3. SAME—CASE STATED.—Five of a number of bills of exceptions sought to be incorporated in a statement of facts were admitted by the trial court to be correct, but because the prosecuting attorney refused to agree to the statement of facts unless all the exceptions were stricken out, the court struck out the whole, including those admitted to be correct. *Held*, that this action of the court was erroneous. See the opinion *in extenso* on the question.

4. TRANSCRIPT.—The fact that a pleading or paper was stricken out by the trial court does not justify the clerk in omitting it from the transcript. All the proceedings should be sent up.

APPEAL from the District Court of Navarro. Tried below before the Hon. L. D. Bradley.

On the nineteenth day of May, 1880, an indictment was filed in the District Court of Navarro county charging the defendant and one William McWhorter with the theft of horses, mares, mules, etc., on the fourteenth of March, 1877, the property of M. S. Finch, Sr., and R. E. Finch. The defendant, R. A. McWhorter, was tried on the fourth day of January, 1883, was convicted of theft, and his punishment was assessed at five years in the penitentiary.

William Magness was the first witness introduced by the State. He testified, in substance, that the defendant and his

cousin, William McWhorter, came to witness's house in Navarro county early on a Sunday morning in February or March, 1877, and remained there until Monday morning. The defendant was riding a dark bay or brown horse, and William McWhorter was riding a light bay with a bald face. The defendant said that he was buying stock, and the witness informed him that Henry Johnson, who lived five or six miles distant, had a jack to sell, and advised him to purchase it. The defendant and his companion came to the witness's house from towards Johnson's, and returned the same route next morning, saying they were going to Johnson's.

The witness saw the defendant's saddle-bags, and in one pocket of them saw two ears of corn and a pistol. He did not see into the other pocket. He did not know that the defendant made any exhibition with lanterns at his house on that occasion. The witness afterwards heard through Mr. Finch of the theft of the horses. This was after the defendant's arrest. In showing some photographs to the boys about, which he carried in his pocket-book, the defendant exposed a roll of money which looked to be about the size of a man's hand. He made no ostentatious show of this money, but William McWhorter remarked to him that he was "green" to be showing his money.

Cross-examined, the witness stated that he first formed the acquaintance of the defendant and his father in Denton county, in 1860, when they lived within ten miles of him. He next saw the defendant when he was breaking horses at Finch's. When the defendant reached the house of the witness on the Sunday morning stated, he said that he camped on the road with some movers the night before. He also said that he was on his way home; but, when told of Johnson's jack, he turned and went back, leaving the witness's house about eight o'clock on Monday morning. The witness could not remember that anything was said about buying mules. The witness lived in the southwest corner of the county, five or six miles from Pisgah, in a not very thickly settled neighborhood. Finch lived near the line of Navarro, Limestone and Freestone counties. The bulk of Finch's stock ranged about Bold Hill, in Limestone county.

M. T. French testified, for the State, that in February and March, 1877, he kept a public house in Dresden. About the time of this alleged offense two men came to the witness's house with a bunch of twenty-five or thirty horses, and put up over night, getting supper but leaving before daylight next morning.

They paid their bill that night. The witness did not remember that they gave their names, though they made no apparent efforts at concealment. The witness paid but little attention to the horses, and remembered no more about the men than that one was tall and the other very small. They said that they had brought the horses from Limestone county and were taking them to Waxahachie. When they left the witness's house, they went east through Dresden. The witness could not remember how soon afterwards the parties in pursuit passed his house, but it was a few days.

The cross-examination developed nothing of a material nature.

Noah Armstrong testified, for the State, that in February and March, 1877, he lived with R. F. Slaughter, in Navarro county, and had charge of Slaughter's stock. A man named Lee reported to Slaughter that he saw some men driving the horses alleged to have been stolen, and the witness went in pursuit. He found a trail made by horses the evening before, which crossed Richland creek at an old out of the way crossing. With a man named Parks the witness followed this trail ten miles to Dresden, and found that the parties he was after had stopped at French's.

The witness, by inquiry along the road, obtained descriptions of the men and of the horses they rode, and followed them towards Dallas from Dresden, passing through Ennis and other small towns. He overhauled the horses within a mile of Dallas, about noon. No one was with the horses at the time he overtook them, but they suited the descriptions given to the witness along the road. After a while two parties, riding such horses as were described to the witness, rode slowly towards the witness, and the witness asked them if they owned the bunch of horses. They replied that they did not. Thereupon the witness leveled his gun at one of the parties, telling him that he was a prisoner; and the other fired at the witness. As the witness turned to shoot at him, the first party fired upon the witness. The witness emptied his gun in the engagement and succeeded in arresting the man called Bob McWhorter, after wounding him. The other man got away. Witness turned Bob McWhorter over to the sheriff of Dallas county.

Mr. Finch claimed the larger number of the horses in the bunch. They numbered about twenty-five head when the witness recovered them, but the men had dropped several on the

road. ·The witness brought the horses back and turned them over to Mr. Finch. The witness could not give the day of the week or month, or even state the month of these occurrences.

Cross-examined, the witness stated that Parks was somewhere about during the fight at the time of the arrest, but the witness did not 'know where. The horses ridden by the men suited the description given the witness along the road. The horses were driven through the town of Ennis, where the parties traded off one of them. In following the trail in pursuit, the witness was sometimes off the road. The witness could not state the day he left Slaughter's in pursuit, further than that he started the morning after the evening on which Lee told him about seeing the men, and when he reached French's, in Dresden, he found that the men had stayed there the night before.

R. E. Finch testified, for the State, that he was a son of M. S. Finch, Sr. He and his father owned horses on the range in Limestone, Freestone and Navarro counties. The witness lived south of Pisgah, two or three miles from Johnson's, and three or four miles from Magness's. The brand of the witness and his father, with which the defendant was well acquainted, was a circle F. The defendant lived at the house of the witness's father three or four months during the year 1875 or 1876, breaking horses. The witness never saw the defendant in that neighborhood after he left the employ of Finch, Sr., in 1875 or 1876, as stated. The witness received his first intimation of the theft by a telegram, in February or March, 1877, requesting him to go to Dallas to identify the horses. Edens and Armstrong got on the same train with the witness at Corsicana. He found a bunch of twenty or thirty horses, including a few mules, about one mile out from Dallas. The larger number of the animals belonged to the witness's father. Some of them belonged to the witness. The condition of the animals was poor, but about as good as is common to horses at that season of the year. He could not say that the brands were plainly visible. In going from the range to Dresden, the horses would necessarily travel through Navarro county. The witness had charge of his own and his father's stock, and gave no one his consent to take these horses. The witness saw the defendant lying in jail in Dallas. Some one was bathing his leg. He was said to have been shot.

The witness knew this bunch of horses well. It was known as the "Black Nash Mare" bunch. He was certain that they were branded in the brand of himself or father. He had never

tested to ascertain whether or not the brands on all of twenty or thirty head of horses would, at that season of the year, be dim and indistinct, but he did not think that all would be so dim as not to be distinguishable.

On cross-examination, the witness stated that when the defendant worked for his father, in 1875 or 1876, he bore a good reputation for probity and honor. In the opinion of the witness, such horses as those stolen on this occasion would, at the time of year they were taken, have their brands very dim and indistinct.

J. W. Edens testified, for the State, that in February or March, 1877, as deputy sheriff, he went to Dallas with Mr. Armstrong and Mr. R. E. Finch, to see about some stolen horses. He saw the defendant in jail in Dallas. He was then wounded in about four places. Witness saw and got from the sheriff a saddle horse said to have been taken from the men who were taken with the horses, which horse he turned over to the sheriff of Navarro county. He saw at the same time a pair of saddle-bags. In or about the saddle-bags the witness found ropes and dark lanterns. He met O. C. McWhorter, the defendant's father, in Dallas.

The witness made two trips to Dallas, both times with warrants for the defendant. On his first trip, he found that defendant had made application for a writ of *habeas corpus*, which was to be heard shortly. The witness returned again with a warrant, and heard the case on *habeas corpus* argued. The defendant was released, but was remanded at once to the county jail, the authorities refusing to turn him over to the witness. The witness arrested the defendant in Clay county in 1880.

Cross-examined, the witness said that the saddle-bags were not turned over to him by the sheriff of Dallas county. He was not positive whether the ropes and dark lanterns were in the saddle-bags or merely lying around about them. They were, however, pointed out to him as the defendant's property. Armstrong had filed a complaint against the defendant in Dallas county, charging him with assault to murder.

J. O. French, for the State, testified that in 1877 he lived about four miles south of Dresden, and about three and a half miles from the McCabe crossing. That crossing is about eight miles from Dresden. In the spring of 1877 he heard of the theft of a bunch of horses from Mr. Finch, and that they were driven through the county. On one Sunday evening during that spring

a bunch of twenty-five or thirty head of horses were driven rapidly by two young men towards Dresden, going from the direction of the crossing. One of the horses ridden by one of the men the witness afterwards saw in the possession of deputy sheriff Edens.

Cross-examined, the witness stated that, as he did not know where Finch lived, he did not know how far it was from his house to the McCabe crossing. It was about fifteen miles from the "line" to that crossing. The road running by the witness's house was not a public road in 1877, but it was the most direct route from the McCabe crossing to Dresden.

The State proved the want of consent on the part of M. S. Finch, and then closed.

John Lee was the first witness introduced by the defense. He testified that he lived on Richland creek. In 1877 a drove of horses were driven off, passing behind Blake Lee's. Blake Lee told the witness that he thought they were stolen, and went to give such information to Mr. Slaughter. The witness followed, and knew that the horses, twenty-five or thirty in number, were driven across Richland creek. They were not crossed at a public crossing. The witness saw the two young men having them in charge. Neither of them was the defendant. He knew the defendant, and if he was there, or anywhere about the horses, the witness did not see him. This was in the spring of the year, when the brands on all horses are usually dim and indistinct.

On cross-examination, the witness reiterated the substance of his testimony in chief. He did not think that O. C. McWhorter had ever gone to see him at his or Richie's house about this case. He did see O. C. McWhorter once, for about five minutes, at Richie's house. He did not remember telling him anything about he or Richie being able to testify that the defendant purchased the horses. He did not remember that he told his brother, Blake Lee, that he followed the horses across the creek and failed to see the men.

The material substance of the testimony of Charles Richie, for the defense, was that he was with the last witness, John Lee, when he followed the horses across Richland creek, and saw the two men having them in charge. The defendant was not one of them, and if he was in the neighborhood the witness did not see him. The two men were strangers to the witness.

The testimony of Blake Lee, for the defense, was immaterial, except his statement that his brother told him that he followed

the horses across Richland creek, but failed to see the men.  His brother also stated that he did not know the men, nor did he know the horses.

O. C. McWhorter was the next witness placed upon the stand by the defendant.  He testified that the defendant, who was his son, was nineteen years old in February, 1877.  At that time the defendant was engaged in trading in horses and mules on the witness's account, and, in that business, left the witness's house about Christmas with forty mules and horses.  He bought some of them from Muggaw, paying over seventy dollars per head. That bunch was reasonably worth five thousand dollars.  The business of the witness was to follow the defendant and collect of parties to whom the defendant sold on credit.  In 1877, the defendant was conducting this business under the direction of the witness, and was using the capital of the witness.  Both he and his cousin, Wm. McWhorter, were very boyish in appearance at that time; neither of them had whiskers or mustache.

The cross-examination resulted in a detail of the business enterprises of the witness under the management of the defendant. The bay horse captured at Dallas was a horse the defendant had bought from Dr. Thomas, of Tyler.  The other horse captured at the same time had been raised in Dallas county.  The witness went to Dallas when he heard of his son's trouble, and found him in jail, wounded.  Edens and Armstrong were there at the time.  The witness did not see the bunch of horses in question. The defendant rendered a full and satisfactory account to the witness of his business transactions.  The witness did not remember that on the last trial he stated that he had no interest in this bunch of horses found in his son's possession.  He did say that if his son claimed any interest in them it was the money of the witness that bought it.  The witness had always said that if the defendant was in possession of the bunch of horses alleged to have been stolen, his, the witness's, money bought them.

The witness declared that he had never gone to see John Lee about this matter.  He saw Lee once for about five minutes, at Richie's, but said nothing to him about the case.  The witness did not think that Richie ever told him that he saw the defendant buy three horses.

R. H. McLeod testified, for the defense, that on the Sunday before the horses were said to have been driven off, he saw the bunch belonging to Mr. Finch, and known as the "Black Nash

2H

Mare" bunch—the bunch described as those stolen—some three miles from their accustomed range. The witness knew the bunch well, and knew that it was on the Sunday in question that he saw them. This was between ten and two o'clock. The witness saw no more of them until they were said to have been driven back from Dallas.

W. R. Richardson testified, for the defense, that he and Hodges were hunting cattle in the spring of 1877, when they were over-taken by the defendant and another young man. The defendant said that they were out buying stock, and asked the witness if they could buy any in the neighborhood. While the four were riding along together, they met up with two strangers, driving a bunch of horses which they said were for sale. One was a tall, slender man, and the other a short, chunky man. The defend-ant purchased those horses from those two men, and they were delivered to him between the McCabe crossing and Dresden. The witness saw the defendant pay an amount of money to these men, and saw him receive the horses. The bunch numbered be-tween twenty and twenty-five head. The witness told no one about this until after the trial and conviction of this defendant at a former term of this court.

On cross-examination, the witness explained his silence about his knowledge by saying that he did not know that his testi-mony was material, and that, though he had heard of the arrest of a McWhorter for horse theft, he did not know that it was the defendant. Otherwise his cross-examination was an elabora-tion of his evidence in chief.

*Simkins & Simkins* filed an able and elaborate brief for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, J.   We find in the record in this case the following bill of exception:

"Be it remembered, that on the trial of the above cause the defendant took various bills of exception to the rulings of the court on the introduction of testimony, and incorporated them all in the statement of facts. On inspection of the bills of ex-ception so incorporated in the statement of facts, the court found some of them correct, which are numbers one, two, three, four and five, and the remainder incorrect.

"The court struck from the record all the bills of exception,

including the above-numbered ones found by the court to be correct, for the reason that they were incorporated in the statement of facts and not presented separately, and because the county attorney refused to sign or agree to the statement of facts until they were stricken out. To which ruling defendant excepts, etc.

"L. M. Bradley, Judge, etc."

This action of the court as presented in the above bill is assigned as error. Rule 56 for the government of district courts, provides that "exceptions to evidence admitted over objections made to it on the trial may be embraced in the statement of facts, in connection with the evidence objected to." (2 Texas Ct. App., 666, Rule 56.) This rule has been held to be applicable to criminal as well as civil cases. (*Cooper* v. *The State,* 7 Texas Ct. App., 194; *Castanedo* v. *The State,* Id., 582.) It applies, however, to evidence *admitted,* and not to that which is *excluded.* (*Green* v. *The State,* 12 Texas Ct. App., 51.) In this case it appears that the exceptions taken and incorporated in the statement of facts related to the rulings of the court on the *introduction* of evidence, which, we infer, was on the *admission* of evidence. It also appears that the court found some of those exceptions, five in number, to be correct, but that others were incorrect, and yet he struck out *all* the exceptions because the county attorney refused to agree to the statement of facts until the exceptions were stricken out. We are not apprised by the record as to what particular evidence admitted the five correct exceptions related to, nor do we think it is necessary in this case that we should be, though it would have been more satisfactory, and better practice, if this information had been contained in the bill of exceptions.

It is enough for us to know, however, that a substantial legal right has been denied the defendant by this action of the court. He is guaranteed the right of appeal, and in the prosecution of this right the law entitles him to have presented to this court for review the proceedings and rulings of the trial court. He endeavored to avail himself of this privilege, in a manner sanctioned and provided by law, but by the action of the judge has been prevented from bringing before this court the important question as to whether or not he has been convicted upon competent and legal evidence. He relied upon bills of exceptions incorporated in the statement of facts, which he had a right to do. Five of these bills were admitted by the judge to be cor-

rect, and yet they were stricken out, and he has been denied the benefit of them. At the time they were stricken out of the statement of facts it was too late for him to present other bills, or to prove his exceptions by bystanders (*Green* v. *The State*, 12 Texas Ct. App., 51), and he was therefore left without a remedy. We cannot sanction such a practice as this in any case. If any of the exceptions were correct (and it is admitted that five of them were), the defendant was entitled to the benefit of them, whether it accorded with the peculiar views and wishes of the county attorney or not. If the county attorney did not see proper to agree to a statement of facts, it was the duty of the judge to make out a statement and file it as a part of the record.

Numerous other errors are assigned, but we have not given them close attention, because we do not consider that the case is properly before us, the defendant having been precluded, without any fault of his own, from presenting his whole case for review by this court.

There is one other matter, however, which we will call attention to, for the information of the clerk who made out the transcript in this case, and for the information of other clerks who may have like views with him. An amended or supplemental motion for a new trial was made by defendant, which, upon motion of the county attorney, was stricken out. In making up the transcript the clerk refused to incorporate in it this amended or supplemental motion, the motion to strike out, and the judgment of the court thereon, and the defendant has been forced to a *certiorari* to perfect the record, in order to bring before this court that portion of his case. Transcripts should contain all the proceedings had in the case, and should conform to the rules governing transcripts in civil cases. (Code Crim. Proc., Art. 860.) These rules are prescribed by Article 1411 *et seq.*, Revised Statutes, and Rule 82 *et seq.*, for District Courts. (2 Texas Ct. App., 671.) Because a pleading or paper is upon motion stricken out, is no reason why it should not be incorporated in the transcript. It may have been erroneously stricken out, and of vital importance in the case, and the party aggrieved by the error has the right to present it on appeal.

Because the court erred in striking out from the statement of facts the defendant's exceptions to the admission of evidence, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered February 28, 1883.